The next case is Weber, Inc. v. Provisur Technologies, Inc. Mr. Crudo? Yes, Your Honor. Is that correct? Yes. Okay. You have reserved three minutes of your time for me, but... That's correct, Your Honor. Okay. We're all set. Ready to go. Okay. Good morning, Your Honors. You may have pleased the Court. The Board committed several reversible errors here, and I'll start with the threshold printed publication issue. The documents here are user manuals familiar to anyone who has purchased a commercial product, and it's undisputed that the manuals describe a product that Weber had been advertising and selling on the open market for years. And as a general business practice, Weber provides the manuals to customers who purchase the product. Here, it's undisputed that Weber provided the manuals to at least ten companies and their hundreds of employees and used the manuals as teaching guides to train the employees. So to you, what's the difference, when we use the words in this context of this case, whether something is publicly accessible and whether something was publicly assessed? Well, Your Honor, this Court's cases, including in GoPro, make clear that the hallmark or the touchstone of the printed publication analysis is accessibility, meaning that interested members of the relevant public must be able to locate the documented issue, exercising reasonable diligence. They don't need to actually access it. You don't have to show that the manuals were actually accessed by somebody? That's correct, Your Honor. Going back to Anne Ray Hall, this Court held that a graduate thesis sitting on the library shelf was publicly accessible, notwithstanding evidence that no one ever looked at it. But here, we do have evidence that the manuals were indeed accessed. We distributed the manuals to at least ten customers and their many employees, and we have evidence that a Weber employee showed the manuals to an attendee at a trade show, making this case very similar to GoPro. So here's the numbers ten, correct? That's what the Board found, correct. We dispute that finding, but accepting that finding, that should have been more than sufficient. And did the Board find that those ten were related to customers of the device at the trade show, or ten prospective customers? Your Honor, those ten companies were companies that actually purchased the underlying machine. But the same was true in enhanced security, where this Court held that a user manual, it was just, do you have to buy, did you have to buy a machine in order to receive the manual? No, Your Honor. That was one vehicle by which one could obtain the manuals. There were others. For example, we made them available upon request. And we have documentary evidence that is e-mail communications between prospective buyers and Weber in which the prospective buyers actually requested the manuals and received the manuals. In addition, we also made the manuals accessible at trade shows and at open houses. And Mr. Horst testified in his declaration that he actually showed an attendee at the trade show the manual, and in fact that that attendee asked to see the manual, which further shows that interested members of the relevant public knew that these manuals existed and they knew how to access them. The Board rejected a lot of that evidence because it came from the mouths of your own employees. Isn't that essentially a credibility determination that we have to defer to? No, Your Honor. It is true that the Board found that our witness testimony was not credible based on bias associated with their employment. But we have to remember that these are Weber publications, and so the only witnesses who are competent to testify about their authorship and distribution are Weber employees. The same was true in Gopro. The single declarant that this Court found was sufficient there was offered by an employee of the IPR petition. I might agree entirely with all that, but isn't that the Board's call whether to find that evidence credible or not? Well, to make a categorical finding on that basis, Your Honor, I think is improper, especially when— Can you point to any authority that would make that improper? No, Your Honor, other than APA law, OPRA products that says that the Board has to consider all evidence. Here, the Board placed almost dispositive weight on provisor's employee declaration when that declaration was offered by an employee of the provisor, and at the same time discounted our evidence merely because the declarant's— Was any of it based on credibility? No, Your Honor. No. It was a categorical, oracle rejection based on their employment status. So they relied on their witness statements, which would have the same kind of bias that yours did. That's exactly right, Your Honor. That's exactly right. And that's arbitrary and capricious, and it's certainly not substantial evidence. And if we turn to the Board's analysis of the trade show evidence, we see that it's riddled with legal error beginning in Appendix 31 and going on— I'd just like to get into—I mean, this seems to me the Board has just completely misunderstood our court's decision, which was based upon a very specific set of facts, where somebody gave a science paper that it's perfect for his colleagues, and everybody understood he shouldn't share it. That seems in no way publicly accessible. The Board seems to have taken from that the notion that confidentiality per se destroys any possibility of public accessibility. Do you agree with that? I agree completely, Your Honor. The Board read those— No, you don't agree. No, I agree with you. I agree with your interpretation that the Board misinterpreted Corwin's. That's what I'm trying to say. So I guess what bothers me about the Board's decision here is that it said, you know, you could—anybody that wants this manual can get it, right? All they have to do is buy the product. And they place a lot of emphasis on the fact that these are very expensive products. But so what? That's the relevant market for these products. Isn't that who the public is? The Court has also seemed to have misunderstood or misunderstand public documents over and over again. We keep having to reverse the puppets. And public accessibility is not—I know I'm preaching to you. They can answer this when they get it. It's not the general public. It's the public that's interested in this kind of area. Aren't the consumers, the buyers, of these meat slicers? Wait, are these meat slicers? Yes. I was worried I was getting it mixed up. No, no. That's correct. You're exactly correct, Your Honor. We can talk about this all day because this is really interesting. But I would like to move on to the client construction issues. And my specific question is, if we disagree with the board's claim of construction over disposed over and find that it's only read it to cover an embodiment, which is completely against our case law, is there any dispute that we have to sit back and dispose over? Does it mean what you say it means? Or can we reverse? I think this Court can reverse. Now, Proviso did make a passing statement in its red brief suggesting that a lack of complete overlap might not matter. I don't understand that argument, Your Honor. There is never a dispute below. And I don't believe there is a dispute on appeal that if we get our construction, that the Court should and can reverse outright. Can you help me with what exactly is in dispute about what has to be offset? Because it seems you both agree something cannot be offset, and you both agree other things perhaps can be. But what exactly do you understand the dispute to be? Yes, Your Honor. To be crystal clear, in our prior combination, all major components of the feed apparatus are indeed directly above and laterally aligned with the exception of one component. And that is the mechanism that drives the drivers. So the sole dispute here before this Court is whether that mechanism has to be laterally aligned with the loading apparatus and the lift rail. Is that called the conveyor? The conveyor belt that drives the workers. That's correct, Your Honor. And the claims don't require that. The claims use nontechnical language that's quite simple. It says that the feed apparatus must be disposed over, that is, above the loading apparatus. Now, to Your Honor's question, everyone agrees that the drivers and the feedback have to be laterally aligned, because that's required by other claim limitations and described in the specification. But there's certainly nothing in the claims or the specification that require the conveyor belt that drives the drivers. And do you articulate or have you articulated in the record a specific construction that would accomplish what you've just said? Below, Your Honor, we said that disposed over would just mean above. But it clearly is narrower than that, even on your own telling. Well, Your Honor, to be clear, the requirement that the grippers be laterally aligned with the lift rail is actually imposed by different claim limitation, not the phrase disposed over. So even accepting that the grippers have to be laterally aligned, that isn't a requirement that is imposed by the language disposed over. But if this Court were inclined to hold that disposed over means above and that, you know, the grippers and the feed path are laterally aligned, that would be fine. That doesn't change the fact that our prior work disclosed that. Well, no, Your Honor, I don't think so. I mean, if we look at figure two of the patents, for example, an appendix, figure two shows the servo motors, which are element 850, which are indisputably part of the feed apparatus. And those components are outside of the footprints of the lift rail. That is, they are not laterally aligned. And those components, like the conveyor belts, are also expressly recited in the claims. And yet no one would say that the feed apparatus is not disposed over. So the Board drew this arbitrary distinction between components like the servo motor and other components like the conveyor belt. How about on the last limitation, stop date? Yes, Your Honor. Is it your contention that the Board misunderstood your Sandberg-based theory or that they understood it and just wrongly evaluated it? Your Honor, to be clear, the Sandberg theory only applies to the 812 patent. I just wanted to make that clear, not both patents. But in any event, we believe that the Board misunderstood our theory. We relied on Sandberg's operational method, that is, loading a food article in the slicer while the previously loaded food article is finished being sliced. That improves efficiency, and it doesn't matter what type of machine you use that method on. If you were to use that method on the 904 slicer, you would have to lower the lift rail so as to load the new slice. And the Board seemed to believe that we were relying on Sandberg's structure, that is, Sandberg's actual stop gate, rather than the operational method. And that simply was never our argument, Your Honor, so that rises to an APA violation. And the Board failed to consider both references in combination. It viewed Sandberg in isolation. I thought you were relying on our own manuals for the stop gate. That's correct. Our primary reference was our own manuals. But for the 812 patent, we also relied on Sandberg. But to your point, Your Honor – oh, I'm sorry. To your point, Your Honor, I don't even think we need Sandberg to show that this limitation is satisfied. To be clear, the limitation requires that the claim stop gate be in a food-supporting position as the lift rail is being lowered. We only had to show one example in the art that satisfies that limitation, and that's exactly what we did. We pointed to Figures 10 and 227 of the manuals. That's at Appendix 1331 and 1480, both of which show the product bed conveyor, that is, the claim stop gate, in a food-supporting position with the grippers directly overhead. So if they were grasping food, that food would be supported. And they both show that the lift rail is in the lowered position. We also relied on the textual description of Figure 10 at Appendix 1331 that says in no uncertain terms that the product bed conveyor supports the transport of product, that is, the food product. Now, from those – What about the Court's argument that this doesn't show everything because it doesn't show where the food would be? I don't understand that argument – or that finding, Your Honor, because as I noted in the passage that I just quoted, the manual indisputably says that it supports the transport of food. And even if it didn't, these are apparatus claims that don't require the machine to actually be loaded with food. I mean, we know where the food is going to be, probably, because it has the grippers and all that. That's exactly correct, Your Honor. Can we reverse on stop gate, or do we have to vacate the room and that's Purdue? Your Honor, I think you can reverse. I think the figures clearly show the stop gate in the food-supporting position with a lift right down, and that in combination with the passage that we rely on and which the Board ignored satisfies the limitation. What about the one that requires Sandberg? Well, it's the same limitation for both, Your Honor. So if this Court were to find that the manuals don't disclose the limitation on its own, then it would have to vacate with regard to Sandberg and set it back down. If there are no other questions, I will save my time. Thank you. Good morning, Your Honors. May it please the Court. The Board went out of its way to do three separate stand-alone rationales of patentability in this case, and as you know, any one of those three rationales is sufficient to be dispositive and sufficient for you to affirm the judgment. Any one of those three. They have to win on all three, and they can't do that. Could you start on the printed publication and the quotas that you've outlined, some of the distinctions that seem pretty obvious? What is your response? Well, Your Honor, I think we all know that under the printed publication law, it's a totality of the circumstances, case-by-case, highly factual inquiry. And when you look at the facts in this case, we have fact after fact and determination after determination, wang after wang. Can you point to a single fact here of somebody who wanted to see the manuals not being able to see them? That's the whole world, Your Honor. The only evidence you have of someone that could see the manuals is the ten customers who paid hundreds of thousands of dollars. Is there any evidence that more than ten customers wanted to pay hundreds of thousands of dollars to see it? Well, that's the point. It's not publicly accessible, and no one else would have wanted to see it. If you had that, let's say. When you say ten customers, you mean individual entity companies, right? You don't mean only ten actual people saw this. It's ten entities, Your Honor. Hundreds of people saw this manual. I don't think there's evidence of that here. Anybody that worked at a plant that needed to see this could see this. I don't think that's right, Your Honor. When you look at what the evidence and the findings of the Board is, those manuals were kept under lock and key in cages. They call it a library of addition. So you think the people that operated these machines weren't told what was in these manuals? The record shows that people did not access those manuals. And we have finding after finding from the Board showing why that is. They're kept under lock and key. You have people that worked in the industry for 30 years that had never seen a manual. You have these self-interested declarations, which, Your Honor, you asked about, is there demeanor-based credibility. There was a huge deal for the Board here. We have these six declarations where their employees come out and say, you know what, we would have given it to anyone that asked. Well, in the last deposition in this case, they have an employee who gets up there, and I was shocked when I saw him under cross-examination. He says, well, yeah, but, you know, we would have given it out, but we had to get permission from the CEO of sales. And that actually no one ever actually provided that permission. So there was a huge credibility deformation. It was not credible for them to put in these six. Why isn't the 10 enough? Pardon me? Why isn't the 10 enough? Well, you know there's no guideline rules when we're talking about printed publications. So 10 could be enough in certain cases. But in the case here, as the Board said in its final written decision, the major difference between this case and enhanced security is the confidentiality. The what? Confidentiality. The long, long record of confidentiality. It's not just the provision on the inside of the manual. It's not just the general terms and conditions. It's the declaration that we have of people talking about the industry. In other words, we have 10 sets of general terms and conditions where these companies restricted access. So it's the totality of the circumstances. Maybe 10 people got it, but no one else could get it because it was all confidential. It was required to be confidential. Anybody that bought the machine could get it. Those are the only people that could get it, Your Honor. Those are the only people interested in it? I mean, this is the public. The Board has, again, confused the general public. I can't walk off the street and get it unless I'm going to buy it. But if anybody in this industry wants the manual, they can buy a machine. There's no limitation on who can sell the machine. And your law, Your Honor, is that you need to exercise reasonable diligence in order for something to be publicly accessible. So going off the street and buying an $800,000 meat slicer, that is not reasonable diligence. Why does the amount make it any relevant? What if the slicer costs $50? That's different. Why? That's different. You could walk off the street. No, no, no. You can't talk like that. I'm sorry. The $50 meat slicer may be a public thing that, you know, retail homeowners are going to use. So you think that would be okay. This is a commercial slicer. So the relevant audience is people who are interested in commercial slicers. These are people that can afford to buy a $500,000, $800,000 machine. Why isn't the fact that it is publicly accessible to them that it's not?  Your Honor, we have a totality of circumstances test where you need to consider all of the evidence. Accessibility, limited accessibility to only 10 people, that could be part of it. Confidentiality is a big part of it, too. And that's what the Board would like to hear. How does confidentiality come from? Does it come from our Quartus case? That's one of the examples, yes. Where else? I don't remember. Because the Board is completely over read that Quartus case. Well, I mean, the facts here. The facts in the Quartus case, you have to admit, aren't anything close to here. It's a scientific paper presented to three or four colleagues in the same field with the expectation, not disputed, that they wouldn't talk about it to anybody else. Well, I think the facts in this case are stronger than the Quartus, Your Honor. When we talk about the general term and the conditions, the Quartus case had a problem because they actually said that you can share it under the term and the conditions. In the Quartus, the evidence of the whole establishment of the program never attended to and were never actually distributed. And that's what we have here, Your Honor. We only have 10 people. No, we have 10 distributions. What about somebody who wants to kick the tire, so to speak, on the machine? That's a great example, Your Honor. And then they asked to see the manual. Like, let me see the manual so I can figure out how this gate works. They couldn't have gotten the manual, Your Honor. That's what the Board's statutory finding was. They could have gotten something. They could have? They could not. The Board made factual findings about that. These declarations. Yeah. What was the evidence for that? There was declarations saying they freely would give the printed publications out, and the Board rejected that because they weren't credible. They weren't credible based on demeanor. They weren't consistent with the evidence. They were inconsistent. The Board never – They didn't have any opposite evidence to the contrary. Pardon me, Your Honor? They didn't have any opposite evidence to the contrary. They sure did, Your Honor. The deposition testimony, the demeanor evidence, the Board did not believe the declarations of the petitioner. On the colloquially kick-the-tire example, there's nothing in this record that says if Judge Raynor wants to go kick the tires of one of these machines and glance at the manual, he would not be permitted. There's nothing of that. This manual is from what, 2006? There was no evidence that that ever happened, Your Honor. There's no evidence that anyone was ever able to ask for a manual and get it. And they never did. So if you wouldn't mind, Your Honor, I'd be happy to move on to one of the – Well, I just have one more question. In the reply, they put in even more evidence that seems to support that there were at least something like 40 sales worldwide of these expensive machines. Would it make a difference to you if we considered that evidence? Well, that evidence is a mess, Your Honor. And it – It's a mess. The evidence is a mess. If you go back and look at the record, there's invoices, shipping, delivery, notes. And the sales of the 40 are not supported by that evidence. And the Board made that finding. And it's supported by what – the substantial evidence on that. Okay. My question, I guess, is it's not a bright line. You can see that. But if we were to – if we were on remand, the Board were to credit that there were 40 sales worldwide, would that make a difference here? I think it could. I think we'd have to do that analysis on remand. I don't think it would make a difference. You have cases in your case law. Under a case law, does that mean? Well, under your case law, there's the Norman Telecom case, as an example, that has 50 distributions. So I'd be looking at that case for support there. It's a totality of circumstances. The Board would have to weigh that again. Can you address the disposed over limitation? Absolutely, Your Honor. So the missing limitation that we have with disposed over is the feed apparatus conveyor belts. And you have the claim requiring the feed apparatus belts to be disposed over the loading apparatus. The prior combination is missing this element because the feed apparatus is offset to the side from the loading apparatus. So that's why we're arguing about this. That's why they're trying to get this to be broader, to be anything that is above. And that claim instruction is not supported. What do you mean the feed apparatus is off to the side? Not all of it is off to the side, right? Just part of it. The feed apparatus conveyor belts are off to the side in the combination. That's why there's a missing element. Where in the claim does it say conveyor belts have to be disposed over? Well, if you look at the 436 patent claim 1R1B, the claim language is feed apparatus disposed over the food article load apparatus having an upper conveyor assembly. So the upper conveyor assembly with the conveyor belts is part of the feed apparatus. It doesn't use the word belts. It does use the word belts. I cut the claim to show you. It says the feed apparatus disposed over the food article loading apparatus having an upper conveyor assembly with a driven endless conveyor belt using cooperation with the food article grippers. So when we look to the claim, of course, as we always do, we look at what is the feed apparatus. And what the claim talks about the feed apparatus is that you have the conveyor belts and you have the grippers. That's what's the feed apparatus in the claims. So by the claim language of the claims, you have the feed apparatus that's having the grippers and the belts. And that's disposed over the loading apparatus. That's what the claim requires. And that's actually what we see throughout. That's all the claim requires. Why did the board put in a bunch of extraneous words to come up with the claimants? I think the board was trying to resolve what the dispute was between the parties. And this dispute was about the parties. But the board's not allowed to do that, right? I mean, in general, in claimant construction, the board can't add in language to the claim that's not there to overly narrow it. I mean, that's a fundamental base problem. Sure, the Phillips standard, right? So what I think the board did was they tried to clarify, because the parties had a dispute about what the prior art's doing, what is required by the prior art and what is required by the claim. The claim requires the feed apparatus disposed over the loading apparatus, and the prior art didn't have that. So they made those constructions, and they made that extra explanation in order to resolve that dispute because the prior art was different than what is in the claim. And that's completely supported throughout the intrinsic evidence. When you look at the intrinsic evidence in the specification, you see the summary of the invention, appendix 202, column 2. The invention provides a list tray that is located in line with the food article feed pass. And you saw this throughout the board's explanation. They relied heavily on what was described in the specification to support their construction of the claim terms. So, you know, it kind of begs the question, when we're thinking about what is the claim construction, you know, maybe I could choose different words for what the claim construction is, but the claim construction is certainly not that disposed over is anything that is above. That's exceptionally broad. And what is key here is that the belts and the grippers are in line with the feed path and over that loading apparatus. That's what the spec talks about. Are the grippers in line with the prior art? And the grippers in line. Or are we just talking about the belts? The main distinction was the belts in the prior art. The grippers are over, right? There are different examples of grippers in the prior art. Some are over and some are not. Well, don't you believe that some are and some aren't? No, you're right. If it exposes some of them being over, then that exposes them. Well, so, you know, we have a piece of prior art. Let me ask you this. If we disagree with you that the belts have to be disposed over, and so the belts can be off to the side, is there any dispute that everything else that's required is disposed over? So if we assume that the belts and the grippers were disposed over, then I think we would need that limitation. No, no, no, you didn't. You rephrased it. The belts don't have to be disposed over. Everything else has to be disposed over. Does the prior art show everything else disposed over? I don't believe so, Your Honor. And what doesn't it show disposed over? Well, there's lots of other limitations in the claim. No, but we're not talking about the other limitations. We're talking about the food apparatus assembly. I don't think that evidence is in the record, Your Honor. The board would have to weigh that separately. What do you mean the evidence isn't in the record? The record is the record. Taking apart the belt, can you ever dispute that there's anything except the belts that aren't over? The focus was the belt support, the belt. And let me make a point on this, too, Your Honor. When you're talking about reversal of remand, below there was a number of other arguments that reasoned with my arguments. And besides these missing limitation arguments, the board says that in the final written decision. So there's no basis to reverse here. If there was any issues, you would have to remand it to further consider. Where in your record did you say that? The final written decision refers to the other decisions. No, no, no, where in your record did you say that? I don't have that cite before you, Your Honor. Well, you don't have to give me a cite. Did you actually say we have these other arguments and limitations in mind if you're inclined to? There's no grounds for reversal, Your Honor, so I don't know if I made that specific point. You're not answering my question. I don't recall making that argument in the record. I don't recall making that argument in the record. Okay. So let me just briefly address the last argument, which frankly, Your Honor, I think could be the easiest argument here because it's just a straight substantial evidence issue. And this is the stopgap support. And there's a number of issues with Sandberg in the video, so there's an abuse of discretion on the video. What all we need to determine here is if there's substantial evidence for the Board's finding that the prior was missing this limitation. The Board went right to Figure 29 in the manual. You can look at this in Appendix 141. When you make the Board's distinction that the manuals don't show the abuse, do you think that's actually a legitimate distinction? I think that's one of the pieces that I don't necessarily rely on, but what's much more important is this Figure 29. Why is it a legitimate basis in your judgment? So we've got the stopgap that can be supporting the food, and the issue is what is the lift rate doing, and is it supporting it at the right time? And you can tell from Figure 29 and what the Board's finding that the stopgap has to be in the floor position in order to meet the claim limitation. I think we all agree about that. You look at Figure 29. This is ejecting the end pieces. This is the end of the cycle. The stopgap is in the up position, the opposite position. It's blocking the food path. It's not acting as the floor. That's a substantial evidence right there, Your Honor. Figure 29 is supported by expert testimony and the rest of the art here, but that Figure 29 is key because it shows that the stopgap is in the wrong position at the relevant time of the claims. It's the lift rate is moving back down, and the stop rate is in the wrong position. Is there any fact dispute about what the video shows, if we think that the video should not have been stripped? Yeah, absolutely. The video, you know, that came in on reply. So there is a fact dispute. There's fact disputes. We don't know what the video is, who did it, when it was.  Okay. You're out of time. Thank you, Your Honor. Counselor, you have a minute to redispose and give you two minutes. Yes, Your Honor. Thank you. I'll be quick. My friend over here on your side suggested that customer employees could not see the manuals. That's wrong. We have testimony. I want to stop. That's not bothering me. Yes, Your Honor. It's really about the video evidence and what it shows and whether it actually shows the food being in the gates and who's supporting it when it's in the right position. Sure, Your Honor. So the provisor has never disputed the merits of the video below, in the proceeding below. That is what the video shows. And it does show exactly what our expert testified that the manual showed, namely the stockade and the supporting position, and the lift rate begins lowering during that slicing process. And so it corroborates our expert's testimony as to how he, as a person in the schoolyard, would have read the manuals and responded directly to provisor's challenge to our crime-official case. Can I ask you on a different point? You suggested just now that we can't reverse because there's still motivation to combine issues in court address. Did you see that in the record? I didn't, Your Honor. I don't believe they ever asked for a remand. Going back to the video, did they ever have a chance to challenge the merits of it? They filed a motion to strike it and then they prevailed, right? That's correct. Your Honor, but they didn't say in their motion to exclude the evidence that the evidence was somehow not authenticated or didn't actually show what the 904 slicer did. They didn't argue in any of their briefing that the evidence, the video evidence, didn't show what we said it did. Did they have discovery on it or did they not? No, Your Honor, they didn't. We submitted those properly before the board, and the board abused its discretion by willfully blinding itself to the video. But to be clear, we believe that we win solely on the manual, and to the extent there was any ambiguity as to what the manual discloses, we had a tiebreaker in the record and that was the video. Okay. Happy to answer any more questions. No further questions. Thank you, Your Honor. We thank the parties for their arguments. This case will be taken on that right.